IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                  Case No. 15-10086-01,02-JTM

JOSE VALENZUELA-ROJO and
RAFAEL GASTELUM-CASTRO,

       Defendants.


MEMORANDUM AND ORDER


Before the court is defendants' Jose Valenzuela-Rojo and Rafael Gastelum-Castro's

Joint Motion to Suppress Evidence (Dkt. 17). This case arises out of a traffic stop that

occurred on Interstate 70 near Colby, Kansas on June 8, 2015. A search of the vehicle

revealed 29 packages that field tested positive for methamphetamine. Defendants argue

that evidence derived from the stop should be suppressed because the initial stop, the

duration of the stop, and the ensuing vehicle search all violated the Fourth Amendment.

At the time of the stop, Valenzuela-Rojo was driving a 2012 Chevrolet Malibu

eastbound with Gastelum-Castro in the passenger seat. Deputy Rich Jimerson of the

Thomas County, Kansas, Sheriff's Department stopped the Malibu for failing to maintain

a single lane of traffic. Valenzuela-Rojo immediately pulled over. Deputy Jimerson

approached the car and asked Valenzuela-Rojo if he was tired; he replied in the negative. Valenzuela-Rojo said that the car belonged to his wife and attempted to hand his cell phone to Deputy Jimerson. Defendants both spoke limited English. Valenzuela-Rojo presented a State of Washington driver's license and vehicle registration in the name of Guadalupe Galaviz. Valenzuela-Rojo said that they were driving from Oregon to Kansas City. Gastelum-Castro presented identification in the form of a Sinaloa, Culiacan, Mexico driver's license.

Deputy Jimerson returned to his patrol car and wrote a warning for failure to maintain a single lane of travel, and called for Undersheriff Marc Finley to assist. Deputy Jimerson returned to defendants' car and returned Valenzuela-Rojo's driver's license. He then asked to see the vehicle paperwork again and Valenzuela-Rojo handed his telephone to Deputy Jimerson, stating that his wife was on the line. Deputy Jimerson spoke on the phone with a woman, who said the car belonged to her, the defendants were family, they had permission to use the car, and they were going to Kansas City to look for construction work. Deputy Jimerson returned the telephone.

Deputy Jimerson asked defendants in Spanish whether they had any drugs or weapons in the vehicle. Valenzuela-Rojo replied in the negative. According to the government, Deputy Jimerson then asked in Spanish whether he could search the car. Valenzuela-Rojo replied, "Okay." Defendants argue that Jimerson motioned defendants out of the vehicle due to his limited ability to communicate with them.

The defendants exited the vehicle and Deputy Jimerson asked them to stand on the

side of the road. Deputy Jimerson and Undersheriff Finley searched the vehicle, quickly noting fresh tool marks on bolts inside a rear wheel well, indicative of a false compartment. The officers asked defendants to follow them to a vehicle repair shop in Colby, Kansas. At the shop, the rear wheel well was removed, revealing 29 packages that field tested positive for methamphetamine.

The defendants argue that evidence obtained as a result of the traffic stop should be suppressed under the Fourth Amendment because: (1) the stop was not supported by probable cause at its inception; (2) the duration of the roadside detention exceeded the permissible scope of the initial stop; and (3) Deputy Jimerson searched the car without consent, probable cause, or a warrant. Defendants do not challenge the search of the car at the repair shop.

The Fourth Amendment is made applicable to the states by the Fourteenth Amendment and protects against "unreasonable searches and seizures" by the government. U.S. CONST. amend IV. With certain narrow exceptions, evidence seized in violation of the Fourth Amendment is not admissible as proof of a defendant's guilt. *Herring v. United States*, 555 U.S. 135, 139 (2009) (citing *Weeks v. United States*, 232 U.S. 383, 398 (1914)). Evidence seized as an indirect result of a Fourth Amendment violation through the exploitation of that illegality is likewise inadmissible. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (fruit of the poisonous tree doctrine).

The Fourth Amendment's protections against unreasonable seizure "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States*

3

*v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968))

Fourth Amendment analyses of traffic stops are governed by the "reasonable suspicion" standards for investigative detentions expressed in *Terry* and its progeny. *United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009). A traffic stop must be supported by a "particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). The principles of *Terry* require a two-pronged analysis: (1) the stop must be "justified at its inception," and (2) the resulting detention must be "reasonably related in scope to the circumstances that justified the stop in the first place." *Winder*, 557 U.S. at 1133-34; *accord Terry*, 392 U.S. at 20. The stop must be objectively reasonable, considering the totality of the circumstances and information available to the officer; the officer's subjective motivations are irrelevant. *Winder*, 557 F.3d at 1134; *see also Whren v. United States*, 517 U.S. 806, 813 (1996).

The court finds that Deputy Jimerson had both probable cause to stop the defendants' vehicle, and a reasonable suspicion that the driver was driving inattentively and in violation of Kansas law. "A traffic stop is justified at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic or equipment regulations of the jurisdiction." *United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008) (quotations and citations omitted). An officer has probable cause when "'the facts available to him would warrant a person of reasonable caution in the belief" that a traffic violation has occurred. *Florida v. Harris*, 133 S. Ct. 1050,

1055 (2013) (evaluating Fourth Amendment probable cause in the context of a search).

Kansas law requires that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane." K.S.A. § 8-1522(a). The facts here establish that Deputy Jimerson performed a routine "turn around" while patrolling Interstate Highway 70 several miles west of Colby, Kansas. He came upon defendants' vehicle, which was traveling without incident. Defendants' car entered a gradual bend in the road. Deputy Jimerson observed the car suddenly drive onto the centerline, veer back across its lane of traffic, and cross the lane again back onto the centerline in a short period of time. He thus observed a violation of K.S.A. § 8-1522(a) and initiated a traffic stop. The stop was justified by probable cause at its inception.

The defendants argue in their Reply in support of their motion that no violation of the statute could have occurred, because Valenzuela-Rojo only drove *onto* the centerline, not *across* it. The defendants stress that federal decisions involving the single-lane statute involve drivers who cross the centerline. *See, e.g., United States v. Zabalza*, 346 F.3d 1255 (10th Cir. 2003). (Dkt. 29, at 3-4). However, the defendants cite no authority for the proposition that K.S.A. 8-1522 is *only* violated when a driver literally crosses the line.

The Kansas Supreme Court has given the statute a different construction. In *State v. Marx*, 289 Kan. 657, 215 P.3d 601 (2009), the court interpreted K.S.A. 8-1522(a) as requiring "a driver to keep entirely within a single lane while traveling on a roadway with two or more clearly marked lanes," unless the circumstances make it "impracticable to stay *within the lane markers*." 289 Kan. at 673 (emphasis added). *See also State v. Rudolph*, 2010 WL

5

348274, *4 (Kan. Jan. 22, 2010). This construction of the statute is further consistent with both common sense and the underlying purpose of the statute — as a matter of public safety, vehicles should not be driven *on* lane markers, but *between* them.

In *Bullard, v. Kansas Department of Revenue*, 2015 WL 3514030 (Kan. S.Ct. May 22, 2015), the plaintiff challenged the administrative suspension of his commercial drivers license following an administrative hearing based upon a positive test for driving while intoxicated. The Kansas Court of Appeals held that under state court precedent, the plaintiff could not challenge the validity of the initial traffic stop in the administrative proceedings. 2015 WL 3514030, at *7. The court thus did not address the validity of the stop, but did observe that the investigating officer testified he had seen the plaintiff's "tires drift[] onto the yellow centerline at least twice, a violation of K.S.A. 2012 Supp. 8-1522." *Id.* at *1.

This interpretation appears to be consistent with decisions from other states involving identical lane of traffic statutes. In *State v. McBroom*, 179 Or.App. 120, 125, 39 P.3d 226, *rev. den.*, 334 Or. 397 (2002), the court observed that the Oregon statute — which is essentially identical to that of Kansas — "make[s] clear that the phrase 'within a single lane' does not mean 'on' the lines that mark or divide the lanes. Rather, the statute requires that drivers stay 'within' the lines that mark the lanes." The same court later explicitly rejected a defendant's argument that "briefly driving onto the center line does not constitute a failure to drive within a lane." *State v. Vaniom*, 232 Or.App. 492, 222 P.3d 49 (2009). *See also Allenbrand v. State*, 217 Ga.App. 609, 458 S.E.2d 382, 383 (1995) (upholding stop where

officer testified he "observed a vehicle in front of him 'weaving within its lane of travel and going onto the center line'").

As the Kansas Supreme Court ruled in *Marx*, K.S.A. 8-1522 requires "more than an observation of one instance of a momentary lane breach." 289 Kan. at 675. Whether the statute is violated depends upon consideration of the entire context of the case, including weather conditions or obstacles in the road. *Id.* at 674. The court finds here that Deputy Jimerson had an objectively reasonably belief that Valenzuela-Rojo's vehicle violated the Kansas single lane statute. There were no weather conditions which rendered it impracticable for Valenzuela-Rojo to stay within the lane markers. There were no obstacles in the road or other traffic conditions making single lane operation difficult. Valenzuela-Rojo twice rode onto the centerline, without any apparent justification. Although the instances of crossing onto the centerline occurred in a curve in the road, the long curve in the highway is neither banked nor sharp. The court concludes that Deputy Jimerson was justified in stopping the defendants' vehicle.

The defendants next argue Deputy Jimerson had no basis for stopping the Malibu, since "no cars were around the defendants" at the time their car rode the center line. (Dkt. 29, at 5). In support of this argument, the defendants cite *United States v. Maldonado*, 614 F.Supp.2d 1179 (D. Kan. 2009), as holding that K.S.A. 8-1522 is not violated in the event of "a lane drift that is minor and d[oes] not pose any danger." *Id.* To the extent that *Maldonado* suggests that actual danger is an essential element of K.S.A. 8-1522(a), it is no longer a correct assessment of Kansas law. Five months after *Maldonado*, the Kansas Supreme Court

explicitly ruled in *Marx* that the statute is properly read

> as establishing two separate rules of the road. The first requires a driver to keep entirely within a single lane while traveling on a roadway with two or more clearly marked lanes. That rule is temporarily suspended when it becomes impracticable to stay within the lane markers and when the driver is properly effecting a lane change. Proof that driving outside the lane markers created no safety hazard is not a defense to the single lane rule. The second rule provides that before a driver may change lanes or move from the current lane of travel to another location, he or she must ascertain that the movement can be made with safety. A traffic infraction occurs under K.S.A. 8–1522(a) when either rule of the road is violated.

215 P.3d at 612. Thus, "we find no support in the statute for conditioning a violation of the single lane rule upon proof that driving outside the lane markers was unsafe." *Id.* at 611.

The defendants next argue that they were illegally detained when Deputy Jimerson expanded the stop past the point necessary to complete the issuance of a warning citation. The government argues that the scope of detention was reasonably related to the traffic violation because the detention ended at the time Deputy Jimerson returned their documents with a warning. The government argues that the encounter became consensual from that time onward.

Generally, a detention must "last no longer than is necessary to effectuate the purpose of the stop." *United States v. Cervine*, 347 F.3d 865, 870-71 (10th Cir. 2003). "During a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check of these documents, and issue a citation or warning." *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007). The driver must then be allowed to proceed without delay. *Id.*

When assessing the duration of an investigative stop, "we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). An individual is "seized" under the Fourth Amendment "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Accordingly, a traffic stop is no longer an investigatory detention — a seizure in Fourth Amendment analysis — when the individual feels free to leave.

> A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer. A detention for a traffic citation can turn into a consensual encounter after the trooper has returned the driver his documentation so long as a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information.

*United States v. Wallace*, 429 F.3d 969, 974-75 (10th Cir. 2005) (internal quotation and citation omitted).

Further detention is permissible if the officer develops "objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity." *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004). The scope of the detention must be objectively reasonable considering the totality of the circumstances. *Karam*, 496 F.3d at 1162. Reasonable suspicion is a lower standard than probable cause and "falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S.

9

at 274. An officer may rely on his "own experiences to make inferences from and deductions about the cumulative information available to [him]." *Id.* at 273.

The following may contribute to reasonable suspicion for extending a traffic stop: an officer's knowledge that drug couriers frequently use rental cars; a motorist's extreme nervousness, which surpasses that typical of a traffic stop and does not subside during the stop; implausible travel plans; and items in or on the vehicle. *United States v. Williams*, 271 F.3d 1262, 1270-71 (10th Cir. 2001); *United States v. Santos*, 403 F.3d 1120, 1129 (10th Cir. 2005). Strong odors may also contribute to reasonable suspicion "that the odor is being used to mask the smell of drugs." *United States v. Salzano*, 158 F.3d 1107, 1114 (10th Cir. 1998). The court should give "appropriate deference to a trained officer's ability to 'distinguish between innocent and suspicious circumstances." *Williams*, 271 F.3d at 1269 (quoting *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997)).

Deputy Jimerson is trained in drug interdiction and has previously testified as an expert witness on interdiction. During the stop, he saw the defendants were speaking on Tracfones when he approached the car, which he knows to be commonly used as "burner" phones in the drug trade. Both defendants appeared extremely nervous for the duration of the stop: their hands shook, they sweated profusely, and Gastelum-Castro avoided eye contact. Gastelum-Castro's pinky fingernail was long, while his other fingernails were trimmed short, a characteristic Deputy Jimerson knows to be common among drug users. A strong odor of air freshener emanated from the car's interior, possibly indicating an attempt to mask the odor of narcotics. Neither defendant owned the vehicle, which Deputy

10

Jimerson knows to be common practice among drug traffickers. Deputy Jimerson also observed inconsistent travel plans: defendants claimed they were traveling to Kansas City to see family, but the woman on the phone claimed they were going to Kansas City to look for construction work. The vehicle was registered in Oregon and the driver had a Washington driver's license. Gastelum-Castro is from Sinaloa, Mexico, where the Sinaloa Drug Cartel is headquartered. Defendants also both had bloodshot eyes, but said that they were not tired.

Deputy Jimerson's observations, taken together and in light of Deputy Jimerson's experience and training, provide an objectively reasonable and articulable suspicion that defendants were involved in drug activity. The duration of the stop was thus supported by reasonable and articulable suspicion that drug activity was afoot.

A search conducted pursuant to consent need not be supported by a warrant or probable cause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Evidence obtained from such a search is admissible if (1) the defendant's consent was voluntary, and (2) "the search did not exceed the scope of the defendant's consent." *United States v. Price*, 925 F.2d 1268, 1270 (10th Cir. 1991). "The question of whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011). Relevant factors include: physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and

11

the display of police weapons. Whether an officer reads a defendant his Miranda rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the circumstances.

Here, defendants were not physically mistreated, threatened, or induced by a promise or aggressive tone. Only two officers were present. Deputy Jimerson did not inform defendants that they could refuse consent, and they are likely not proficient English-speakers. However, Deputy Jimerson obtained consent by communicating in Spanish - defendants' native tongue. He asked defendants in Spanish whether they had drugs or weapons in the car; they responded in the negative. He then asked if he could search the vehicle, to which they said "okay." Their response indicates that they understood Deputy Jimerson's search inquiry as a choice, rather than a mandate. Their consent was thus valid. *See United State v. Lopez-Guzman*, 246 F. Supp. 2d 1155, 1161 (D. Kan. 2003) (consent to search existed where officer knew "enough Spanish to get him through a traffic stop," sought consent in Spanish and English, had received responses in English from the defendant, and the defendant responded to a search request by nodding in the affirmative). Defendants then exited the vehicle without physical coercion or further instruction.

Therefore, defendants' consent for the search was valid and absent coercion.

IT IS ACCORDINGLY ORDERED this 7th day of October, 2015, that defendants'

Motion to Suppress (Dkt. 17) is DENIED.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

13